IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

DAVID PEARSON, et. al.,           §
      Plaintiffs,                §
                      §
v.                                §          No. 3:22-CV-02597-K
                      §
CHARLES GAGE,                     §
      Defendant.                 §

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Pending before the Court is a Motion for Summary Judgment filed on September 20, 2024, by Defendant Charles Gage. (Dkt. No. 40 ("Motion").) The Motion is accompanied by a brief in support (Dkt. No. 41 ("D. Br.")) and an appendix (Dkt. No. 42 ("D. App.")). Plaintiffs David Pearson, Cynthia Pearson, Bailey Pearson as next friend of Z.P., and Valerie Cannaday, as the Personal Representative of the Estate of Zachary David Pearson (collectively, "Plaintiffs"), filed a response to the Motion on December 13, 2025 (Dkt. No. 45), accompanied by a brief in support (Dkt. No. 46 ("P. Br.")) and an appendix (Dkt. 47 ("P. App.")). Gage filed a reply on December 20, 2024. (Dkt. No. 53 ("Repl.").)

The Motion has been referred to the undersigned magistrate judge for a hearing, if necessary, and for findings and recommendation. (*See* Dkt. No. 49.) Having considered the relevant pleadings, the evidence, and the applicable law, the undersigned **RECOMMENDS** that Gage's Motion for Summary Judgment (Dkt. No. 40) be **DENIED** for the reasons explained below.

## I.  BACKGROUND

**A.    Procedural Background.**

Plaintiffs filed their Original Complaint ("Complaint") on November 18, 2022, asserting claims against Gage, a police officer, for the wrongful death of Zachary David Pearson ("Pearson") and for violation of Pearson's constitutional rights under the Fourth Amendment "to be free from unreasonable seizures, by way of excessive deadly force."  (*See* Dkt. No.  1 ("Compl.") at 3.)  Gage shot and killed Pearson while Gage was working an off-duty job as traffic control for a construction site.  (*See id.* ¶ 13.)

On December 30, 2022, Gage filed a motion to dismiss Plaintiffs' Complaint on qualified immunity grounds.  (*See* Dkt. Nos. 8, 9.)   On September 19, 2023, the Court issued an Order denying Gage's motion to dismiss, finding that based on the facts alleged in Plaintiffs' Complaint, Plaintiffs pled a facially plausible claim against Gage for violation of the Fourth Amendment with his alleged use of deadly force that was clearly excessive and clearly unreasonable, and Gage was not entitled to qualified immunity for his use of excessive deadly force.  (*See* Dkt. No. 18.)

On September 20, 2024, Gage filed the present Motion for Summary Judgment, again on qualified immunity grounds, arguing (among other things) that the circumstances confronting Gage at the moment the force was applied must be used to determine the reasonableness of the force, and therefore, to determine whether a constitutional deprivation occurred.  (*See* Mot. at 6 (citing *Evans v. Ball*, 168 F.3d 856, 860 (5th Cir. 1999); *Sorenson v. Ferrie*, 134 F.3d 325 (5th Cir. 1998)).).

2

In *Barnes v. Felix*, the Fifth Circuit reiterated that "it is well-established [in the Fifth Circuit] that the excessive-force inquiry is confined to whether the officers or other persons were in danger at the moment of the threat that resulted in the officers' use of deadly force." 91 F.4th 393, 397 (5th Cir.), *cert. granted*, 145 S. Ct. 118 (2024) (citing *Amador v. Vasquez*, 961 F.3d 721, 728 (5th Cir. 2020)). The "moment of threat" test means that "the focus of the inquiry should be on the act that led the officer to discharge his weapon." *Id*. (cleaned up). "Any of the officers' actions leading up to the shooting are not relevant for the purposes of an excessive force inquiry in this Circuit." *Id*. (citing *Harris v. Serpas*, 745 F.3d 767, 772 (5th Cir. 2014) (cleaned up)). The United States Supreme Court granted certiorari to address whether courts may apply the moment-of-threat rule in resolving Fourth Amendment excessive-force claims. *Barnes v. Felix*, 145 S. Ct. 1353, 1357 (2025).

In light of the Supreme Court's then-pending decision, the Court, on its own motion, determined that it best served justice and judicial efficiency to stay its consideration of the Motion until the Supreme Court issued its decision. (*See* Dkt. No. 58.) On May 15, 2025, the Supreme Court issued a unanimous decision finding the Fifth Circuit's "moment-of-threat" rule irreconcilable with the established "totality of the circumstances" standard. *Barnes*, 145 S. Ct. at 1357. The stay was lifted on the same day. (*See* Dkt. No. 59.) Because "moment-of-threat" is a central issue in this case, the undersigned directed the parties to file supplemental briefing in light of the Supreme Court's ruling (Dkt. No. 60), after which Defendant filed a supplemental brief on June 16, 2025 (Dkt. No. 61) ("D. Supp. Br.") and Plaintiffs

filed a response on July 7, 2025 (Dkt. No. 62) ("P. Supp. Br.").   Accordingly, the

Motion ("Mot.") (Dkt. 40) is ripe for consideration.

Gage submits the following evidence in support of summary judgment:

- Affidavit of Defendant Gage (D. App. 1-5);

- Affidavit of Dr. Stone, with attachments (resume and report) (D. App. 6-32).

(*See* Dkt. 42.)

Plaintiffs submit the following evidence in opposition to summary judgment:

- Exhibit A: Jonathyn Priest Expert Report and CV (P. App. 4-40);

- Exhibit B: Defendant Gage Deposition Transcript and Deposition Exhibits (P. App. 41-163);

- Exhibit C: Joshua Hibschman interview with Mesquite Police Officer Corey Renfro (P. App. 164);[1]

- Exhibit D: Mesquite Detective Dustan Barrett Case Narrative (P. App. 165-73);

- Exhibit E: Mesquite Detective Corey Renfro Notes of Interview with Defendant Gage (P. App. 174-76);

- Exhibit F: Zachary Pearson Autopsy Report (P. App. 177-87).

(*See* Dkt. No. 47.)

All evidence presented is cited to the corresponding D. App. or P. App. page

number(s).  Deposition testimony is additionally cited to the corresponding

deposition transcript page number(s) and line number(s).

---

[1] Plaintiffs' Exhibit C presents video footage of the interaction between Pearson and Gage and was manually filed.  (*See* Dkt. No. 48.)

**B.    Factual Background.**

**1.    Allegations in the Complaint.**

Plaintiffs' Complaint alleges the factual details surrounding the incident from which this case arises.  (*See* Compl.)  On December 5, 2019, Gage, a reserve officer with the City of Jefferson Police Department, was working off duty as a traffic control officer on a highway construction project on Interstate Highway 635 ("I-635"), along with non-party Joshua Hibschman ("Hibschman"), an off-duty police officer with the Seven Points Police Department.  (*See* Compl. ¶¶ 9-11, 13.)

The construction area had not been adequately barricaded that day, and Pearson was able to enter the construction zone around 1:30 a.m. as he was driving eastbound on I-635.  (Compl. ¶¶ 15-16.)  Gage and Hibschman both observed Pearson drive his truck into the construction area where equipment and workers were located, but neither tried to stop him as he continued driving through the area.  (*Id.* ¶¶ 17-18.)  At some point thereafter, Gage and Hibschman were told that Pearson's truck was not an authorized vehicle and that it had struck equipment and a construction worker.  (*Id.* ¶¶ 19, 21.)  Gage and Hibschman began to pursue Pearson in an attempt to stop him and question him about what had occurred.  (*Id.* ¶ 20.)  Both Gage and Hibschman were driving their personal vehicles while working traffic control; they were not driving official police department vehicles.  (*Id.* ¶¶ 22-25.)

Gage and Hibschman had two encounters with Pearson.  During the first encounter, Gage and Hibschman were able to block Pearson's truck from the front and from behind, and all three vehicles stopped.  (Compl. ¶¶ 26, 28-29.)  The three

men got out of their respective vehicles, then Pearson walked toward Hibschman, who was dressed in plain clothes, and asked what was happening. (*Id*. ¶¶ 30-33.) Pearson did not assault or threaten to assault either Gage or Hibschman, but Hibschman shoved Pearson twice. (*Id*. ¶ 36.) Gage then yelled to get Pearson's attention, sprayed him in the face with pepper spray, and struck him twice with a metal baton. (*Id*. ¶¶ 38-39, 44.) Pearson ran back to his truck to drive away, but Gage chased Pearson, smashed the driver's side window with his baton, and tried unsuccessfully to pull Pearson from his truck. (*Id*. ¶¶ 45-47.)

Pearson was able to drive away, and Gage and Hibschman again followed him in their respective vehicles. (Compl. ¶¶ 48-49.) At some point, Pearson pulled over of his own volition, stopped his truck, and put it in park. (*Id*. ¶¶ 50, 125.) Gage pulled his own truck diagonally across the driver's side front of Pearson's truck and struck the corner of Pearson's driver's door with the passenger side front of Gage's truck. (*Id*. ¶ 51.) Gage positioned his truck in such a way that Pearson was not able to drive away. (*Id*. ¶ 52.) Gage got out of his truck and, standing behind the toolbox in the back of his truck on the driver-side, drew his Glock 9mm pistol and pointed it at Pearson's driver's side window while Pearson was still seated inside his truck. (*Id*. ¶¶ 53, 56-57.) Hibschman stopped his own truck behind Pearson's truck, blocking him from leaving. (*Id*. ¶¶ 58-59.) Gage began firing his weapon at Pearson while moving toward the back of his own truck. (*Id*. ¶¶ 60-62; *see also id*. ¶¶ 70, 74-75.) While he was shooting, Gage was perpendicular to and behind the driver's side

6

window of Pearson's truck.  (*Id.* ¶ 63; *see also id.* ¶ 70.)  As Hibschman got out of his

vehicle, he heard gun shots and observed Gage was "sideways" with Pearson.  (*Id.* ¶

64; *see also id.* ¶ 70.)

Gage fired nine bullets, hitting Pearson five times.  (*Id.* ¶ 68.)  Pearson was

alive and gasping for breath when Gage and Hibschman pulled him out of his truck

and handcuffed him.  (*Id.* ¶ 130.)  EMS responded and transported Pearson to a

hospital where he died approximately 40 minutes later as a result of gunshot wounds.

(*Id.* ¶¶ 132-136; *see id.* ¶ 138.)  The shooting occurred at 1:42 a.m., approximately 12

minutes after Pearson entered the construction area.  (*Id.* ¶ 134; *see also id.* ¶ 14.)

Plaintiffs allege that Gage was never in the path of Pearson's truck, which was

completely stopped and in park before Gage shot Pearson.  (*Id.* ¶¶ 65, 71, 73, 76, 127;

*see also id.* ¶ 70.)  Plaintiffs also allege that Gage was never in a position of danger but

was actually moving from a position of safety to an even safer position as he

continued to shoot at Pearson.  (*Id.* ¶¶ 67, 76; *see also id.* ¶¶ 70-79.)  According to

Plaintiffs, Gage was firing his gun "from a position of safety at the side or slightly

behind [Pearson's] truck," which is supported by Hibschman's own observation and

statements to investigators, the location of the shell casings and various bullet holes

in Pearson's truck, and Pearson's autopsy report which describes the bullet trajectory

for each of the five gunshot wounds.  (*Id.* ¶¶ 81-82; *see also id.* ¶¶ 62, 64, 70, 72, 73,

79, 84-88.)

2.    **Summary Judgment Evidence.**

The parties do not dispute many aspects of the relevant events, and the undersigned focuses on critical portions of the summary judgment evidence. Mesquite Police dispatch received a call from Hibschman advising that he and Gage were "in pursuit" of a white Toyota Tundra "that had struck a construction worker on the highway and fought the two officers." (P. App. 166.)  While Mesquite Police dispatch was obtaining more information, Hibschman advised that the suspect (Pearson) was exiting the truck, after which Hibschman's phone disconnected. (*Id.*) Upon callback, Hibschman advised that shots had been fired and requested that Mesquite Police and Fire Departments respond to the scene. (*Id.*)

Gage testified at deposition that he was informed by other workers that Pearson's Toyota Tundra pickup struck a worker and then fled, but Gage did not see the truck strike the worker. (P. App. 54, 12:2-4, 21-23; *see also* D. App. 2.)  Gage stated that during the initial portion of the pursuit, he passed the construction worker who had been hit and observed other workers attempting to render aid. (D. App. 2.)

Gage was driving his personal white Ford F-150 truck, to which he had added lights and decals. (P. App. 71, 29:9-20.)  The word "police" was added to both the passenger- and driver-side doors and across the tailgate. (P. App. 71-72, 29:24-30:1.) Gage was wearing a vest with a cloth Velcro-back police badge that he had purchased, rather than his department-issued police badge. (P. App. 72, 30:2-14.) Neither the badge nor the vest was imprinted with the name of a city or county. (P. App. 73, 31:6-10.)  Hibschman was wearing a black polo shirt with no emblems

8

imprinted on it and khaki pants. (P. App. 164, Video at 34:00-34:20.) Gage initially used his vehicle's front emergency lights and only used the siren when Pearson exited the construction zone. (D. App. 2-3.) Pearson was not speeding during the pursuit. (P. App. 170-71.) In fact, Gage stated that their speed during the pursuit was below the posted speed limit. (D. App. 3.)

After Pearson fled the scene, Gage and Hibschman pursued him until he stopped with his truck "straddling the middle lanes of the freeway." (D. App. 3.) As Gage exited his vehicle, he saw Hibschman "standing in the freeway with his weapon drawn" and Pearson "aggressively approached" Hibschman with his arms out to the side and yelling "What! What!" (D. App. 3.) Gage avers that "[d]uring the pursuit, [Pearson] stopped his vehicle and confronted [Gage and Hibschman] on foot when [Pearson] ignored verbal commands and refused to be detained even after OC spray and a baton were deployed." (D. Br. at 6; *see also* D. App. 3-4.) After the OC spray was deployed, Pearson became "more angry" and eventually ran across the highway. (D. App. 4.) He then "ran toward his truck which had moved 100 yards down the freeway after he exited apparently leaving it in gear." (*Id.*)

Gage and Hibschman tried to pursue Pearson on foot, but they were unable to catch up with him and returned to their vehicles; Pearson got back in his truck and "drove on down the highway," and Gage "resumed pursuit with the red lights and siren activated." (D. App. 4.) Gage drove his vehicle ahead of Pearson's vehicle, and Pearson "stopped in the right lane next to a concrete barrier." (*Id.*) Gage avers that he exited his vehicle and ordered Pearson to get out of the vehicle, but Pearson

9

"began ramming [Gage's] vehicle in an apparent attempt to assault [Gage] and evade detention." (*Id*.) Gage further states that Pearson was ramming Gage's vehicle with his truck and pushing Gage's vehicle into him, which caused Gage to fear for his life and fear Pearson would injure someone else on the roadway if he escaped. (*Id*.)

Plaintiffs dispute these statements, contesting Gage's testimony that Pearson rammed Gage's truck. (*See* P. Br. at 8.) Plaintiffs contend that Pearson was not stopped by the officers but rather stopped on his own volition, that Pearson did not ram Gage's truck, and that Gage and Hibschman fabricated this story as a cover-up. (P. Br. at 7-9; P. App. 74-75, 32:16-33:18.) As support for their cover-up theory, Plaintiffs present evidence that Pearson's truck was in park—i.e., not in the act of ramming Gage's vehicle—when Pearson was shot; Gage told Detective Barrett[2] that he did not put Pearson's truck in park and did not know who did; and Hibschman told Detective Renfro[3] that he believed Gage put the truck in park. (P. App. 173; P. App. 164, Video at 45:05-45:10.)

Plaintiffs point to other discrepancies between the version of events separately reported to investigating officers by Gage and Hibschman. For instance, Gage claimed that Pearson's truck travelled 24-36 inches before striking Gage's truck (P.

---

[2] Detective Barrett of the Mesquite Police Department was called to the scene to begin the criminal investigation and "assigned primary investigative responsibility." (*See* P. App. 168.) Detective Barrett later conducted follow-up interviews with Gage (accompanied by his attorney) on December 10, 2020, and December 17, 2020. (*See* P. App. 171-72.)

[3] Detective Renfro interviewed Hibschman at the Mesquite Police Department immediately following the incident (*see* P. App. 164, 168, 169), as well as took notes of Detective Barrett's interview with Gage on December 10, 2020 (P. App. 174-76).

App. 95, 53:13-19; P. App. 79-80, 37:7-38:16), but Hibschman told Detective Renfro that Pearson's truck was a car-length away from Gage's truck before ramming it (P. App. 164, Video at 42:25). Gage also claimed he heard Pearson's tires spinning (P. App. 175; P. App. 172), but Hibschman told Detective Renfro he did not hear tires screeching (P. App. 164, Video at 38:25-38:30; P. App. 13, 12, 24), and there was no apparent tire scuffing with Pearson's truck's steer tires and no acceleration transfer associated with the drive tires (P. App. 24). Plaintiffs contend this evidence indicates that no ramming or pushing occurred. (P. Br. at 9.)

Plaintiffs further contend that these discrepancies demonstrate that Gage and Hibschman tried to coordinate a false version of that night's events, which included a storyline that Pearson tried to ram his truck into Gage, and they did not have their stories straight in their attempt to cover-up the fact that Gage shot Pearson while Pearson's truck was in park. (P. Br. at 8-9.) In addition, Gage and Hibschman were communicating on their cell phones during the pursuit using an application called Zello,[4] but within minutes to hours after Pearson was shot and killed, the messages were deleted from both their phones. (P. Br. at 9; P. App. 121-23, 79:21-81:11.)

---

[4] Zello is described in Detective Barrett's case narrative as "a push to talk 'walkie-talkie' type application that allows for communication between users, in real-time, without having to be on a phone call." (*See* P. App. 170.) The detective documented his awareness, based on training and experience, "that Zello stores push to talk communications on the user device." (*Id.*)

## II.  LEGAL STANDARDS

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Technical Automation Servs. Corp. v. Liberty Surplus Ins. Corp.*, 673 F.3d 399, 407 (5th Cir. 2012); *QBE Ins. Corp. v. Brown & Mitchell, Inc.*, 591 F.3d 439, 442 (5th Cir. 2009).

"A fact is material only if its resolution would affect the outcome of the action." *Wiley v. State Farm Fire & Cas. Co.*, 585 F.3d 206, 210 (5th Cir. 2009); *accord Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012); *Cooper Tire & Rubber Co. v. Farese*, 423 F.3d 446, 454 (5th Cir. 2005).  "Factual disputes that are irrelevant or unnecessary will not be counted." *Tiblier v. Dlabal*, 743 F.3d 1004, 1007 (5th Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "An issue is 'genuine' if it is real and substantial, as opposed to merely formal, pretended, or a sham." *Bazan ex rel. Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 489 (5th Cir. 2001).  Thus, a genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord*

*Poole*, 691 F.3d at 627; *Bayle v. Allstate Ins. Co.*, 615 F.3d 350, 355 (5th Cir. 2010); *Wiley*, 585 F.3d at 210; *EMCASCO Ins. Co. v. Am. Int'l Specialty Lines Ins. Co.*, 438 F.3d 519, 523 (5th Cir. 2006).  The moving party, however, need not negate the elements of the nonmovant's case.  *See Bayle*, 615 F.3d at 355; *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)); *Millennium Petrochemicals, Inc. v. Brown & Root Holdings, Inc.*, 390 F.3d 336, 339 (5th Cir. 2004).

Once a proper motion has been made, the nonmoving party may not rest upon mere allegations or denials in the pleadings but must present affirmative evidence, setting forth specific facts, to demonstrate the existence of a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 322 n.3 (quoting Fed. R. Civ. P. 56(e)); *Anderson*, 477 U.S. at 256; *Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc.*, 738 F.3d 703, 706 (5th Cir. 2013); *Bayle*, 615 F.3d at 355; *EMCASCO Ins. Co.*, 438 F.3d at 523.  "[T]he court must review the record 'taken as a whole.'"  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); s*ee Riverwood Int'l Corp. v. Emp'rs Ins. of Wausau*, 420 F.3d 378, 382 (5th Cir. 2005).  All the evidence must be construed in the light most favorable to the nonmoving party, and the court will not weigh the evidence or evaluate its credibility.  *Reeves*, 530 U.S. at 150; *Downhole Navigator, LLC v. Nautilus Ins. Co.*, 686 F.3d 325, 328 (5th Cir. 2012); *EEOC v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 615 (5th Cir. 2009).  The evidence of the nonmovant is to be believed,

13

with all justifiable inferences drawn and all reasonable doubts resolved in its favor.
*Groh v. Ramirez*, 540 U.S. 551, 562 (2004) (citing *Anderson*, 477 U.S. at 255); *Cotroneo v. Shaw Env't & Infrastructure, Inc.*, 639 F.3d 186, 192 (5th Cir. 2011); *Tradewinds Envtl. Restoration, Inc. v. St. Tammany Park, LLC*, 578 F.3d 255, 258 (5th Cir. 2009). The evidence is construed "'in favor of the nonmoving party, but only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts.'" *Spring St. Partners-IV, L.P. v. Lam*, 730 F.3d 427, 435 (5th Cir. 2013) (quoting *Boudreaux*, 402 F.3d at 540).

Furthermore, "only reasonable inferences in favor of the nonmoving party can be drawn from the evidence." *Mills v. Warner-Lambert Co.*, 581 F. Supp. 2d 772, 779 (E.D. Tex. 2008) (citing *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 469 n.14 (1992)); *accord Cannata v. Catholic Diocese of Austin*, 700 F.3d 169, 172 (5th Cir. 2012). "If the [nonmoving party's] theory is . . . senseless, no reasonable jury could find in its favor, and summary judgment should be granted." *Eastman Kodak Co.*, 504 U.S. at 468-69; *accord Shelter Mut. Ins. Co. v. Simmons*, 543 F. Supp. 2d 582, 584-85 (S.D. Miss. 2008). The nonmovant's burden is not satisfied by "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,'" by speculation, by the mere existence of some alleged factual dispute, or "by only a 'scintilla' of evidence." *Little*, 37 F.3d at 1075 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)); *Matsushita Elec. Indus. Co.*, 475 U.S. at 586; *Hopper v. Frank*, 16 F.3d 92, 97 (5th Cir. 1994); *Davis v. Chevron U.S.A.*,

14

*Inc.*, 14 F.3d 1082, 1086 (5th Cir. 1994)). "Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003); *accord Firman v. Life Ins. Co. of N. Am.*, 684 F.3d 533, 538 (5th Cir. 2012); *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010).

Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to its case on which it bears the burden of proof at trial. *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corp.*, 477 U.S. at 322; *EMCASCO Ins. Co.*, 438 F.3d at 523; *Cutrera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108, 110 (5th Cir. 2005); *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004). "[W]here the nonmoving party fails to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, no genuine issue of material fact can exist." *Apache Corp. v. W&T Offshore, Inc.*, 626 F.3d 789, 793 (5th Cir. 2010) (internal quotations omitted). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 322-23.

## III. ANALYSIS

Plaintiffs filed suit against Gage asserting claims pursuant to 42 U.S.C. § 1983 for violation of the Fourth Amendment by Gage's use of excessive deadly force and

for wrongful death, as well as a survival claim brought by Plaintiff Valerie Cannaday, the Personal Representative of the Estate of Zachary David Parson. (*See generally* Compl.) Gage moves for summary judgment on the defense of qualified immunity on Plaintiffs' claim for excessive use of force. (*See* Mot., D. Br.)

## A.    Qualified Immunity

The doctrine of "qualified immunity" protects government officials from "liability for civil damages insofar as their conduct does not violate 'clearly established' statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 800 (1982). The qualified immunity inquiry determines whether a plaintiff has shown "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al–Kidd*, 563 U.S. 731, 735 (2011) (citing *Harlow*, 457 U.S. at 818). The court has "discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

An additional consideration exists in the analysis of a qualified immunity defense on a motion for summary judgment. Once a defendant invokes qualified immunity, "the burden shifts to the plaintiff to demonstrate the inapplicability of the defense." *McCreary v. Richardson*, 738 F.3d 651, 655 (5th Cir. 2013) (internal citation omitted). Thus, although the court "draws all factual inferences in favor of the non-movant, . . . once the issue of qualified immunity is raised, the non-movant (i.e. Plaintiffs in this case) bears the burden of rebutting the defense." *See Estate of Davis v.*

16

*City of N. Richland Hills*, 406 F.3d 375, 380 (5th Cir. 2005) ("We do not require that an official demonstrate that he did not violate clearly established federal rights; our precedent places that burden upon plaintiffs."); *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010) ("the plaintiff bears the burden of negating qualified immunity"). "The plaintiff can defeat summary judgment by rebutting the qualified immunity defense as a matter of law or by raising a genuine fact dispute that is material to the issue of immunity." *Johnson v. Eggebrecht*, No. 9:14-CV-144, 2015 WL 9703791, at *4 (E.D. Tex. Dec. 28, 2015), *adopted*, 2016 WL 165091 (E.D. Tex. Jan. 14, 2016) (citing *Trent v. Wade*, 776 F.3d 368, 376 (5th Cir. 2015)). "[S]ummary judgment should be denied if the plaintiff's version of the facts would permit a finding that the official is not entitled to qualified immunity." *Id*. (citing *Lytle v. Bexar Cnty.*, 560 F.3d 404, 418 (5th Cir. 2009)).

     1.    **Viewed in a light most favorable to Plaintiffs, there is sufficient evidence from which a reasonable fact finder could conclude that Gage used excessive force against Pearson.**

"The Fourth Amendment guarantees the right to be free from unreasonable searches and seizures." *Peterson v. City of Ft. Worth*, 588 F.3d 834, 844 (5th Cir. 2009). Specifically, it protects the right to be free from excessive force during a seizure. *Joseph on behalf of Estate of Joseph v. Bartlett*, 981 F.3d 319, 322 (5th Cir. 2020) (citing *Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012)); *see also Tucker v. City of Shreveport*, 998 F.3d 165, 171 (5th Cir. 2021) ("For purposes of liability under 42 U.S.C. § 1983, excessive force claims arising from an arrest or investigatory stop

invoke the protection provided by the Fourth Amendment of the United States Constitution against 'unreasonable seizure.'").

"To prevail on an excessive force claim, a plaintiff must show '(1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force used was objectively unreasonable.'" *Windham*, 875 F.3d at 242 (quoting *Hamilton v. Kindred*, 845 F.3d 659, 662 (5th Cir. 2017)). Determining whether force was excessive or unreasonable is a necessarily fact-intensive and case-specific inquiry, and the test for reasonableness is not capable of precise definition or mechanical application. *Joseph*, 981 F.3d at 322. The analysis "requires a careful balancing of the intrusion upon the individual's interests with the countervailing governmental interests at stake." *Tucker*, 998 F.3d at 171.

A claim for excessive force under 42 U.S.C. § 1983 is analyzed "under the Fourth Amendment's 'objective reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 388 (1989). This inquiry requires analysis of the "totality of the circumstances," which has "no time limit." *Barnes*, 145 S. Ct. at 1358 (citations omitted). Although "the situation at the precise time of the [use of force] will often be what matters most," "[t]he history of the interaction, as well as other past circumstances known to the officer . . . may inform the reasonableness of the use of force." *Id*. Although an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it, *Graham*, 490 U.S. at 396, a violation of this right occurs when a seized person suffers an injury that results directly and only from a clearly excessive and objectively unreasonable

18

use of force. *Joseph*, 981 F.3d at 322; *see also Windham v. Harris Cnty.*, 875 F.3d 229, 242 (5th Cir. 2017).

The Supreme Court has long noted that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 22–27 (1968)). But claims of excessive force necessarily "depend[ ] on the facts and circumstances of each particular case." *Newman v. Guedry*, 703 F.3d 757, 761 (5th Cir. 2012). The amount of force an officer can use depends on what are commonly referred to as *Graham* factors: (1) the severity of the crime at issue, (2) whether the suspect poses a threat to officer safety, and (3) whether the suspect attempts to resist arrest or flee. *Bush v. Strain*, 513 F.3d 492 (5th Cir. 2008) (citing *Graham*, 490 U.S. at 396). The reasonableness of an officer's conduct is viewed objectively without reference to the subjective intent or motivation that underlies the officer's conduct. *Id*. at 397. The court looks at the facts and circumstances "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. at 396. Similarly, the court must account for the difficult and often split-second decisions that police officers must make in carrying out their duties. *Id*. at 396–97.

Here, there is no dispute as to the first of element of Plaintiffs' excessive-force claim—i.e., injury—as Pearson died as a result of being shot by Gage. (P. App. 186.) For the reasons discussed below, however, there are material factual disputes with

respect to whether the injuries resulted from force that was excessive and unreasonable.  *See Windham*, 875 F.3d at 242.

Turning to the *Graham* factors to assess whether there is evidence that could support a finding that Gage's force was excessive, the undersigned first considers the severity of the alleged offense.  The evidence is in dispute on this point.  Gage testified that he was told Pearson had hit a road construction worker and believed Pearson was fleeing from officers.  (P. App. 054.)  Gage, however, did not see the offense, and he does not suggest that facts conveyed to him about the worker's injury led to a conclusion that Pearson had committed a crime as opposed to being involved in a traffic accident.  And with respect to Pearson's flight from police, the unconventional vehicles driven and clothing worn by the officers and the fact that Pearson did not speed in his flight arguably could support a fact finder in concluding that Pearson was not fleeing from people he recognized to be authorized police officers.  (*See* P. Br. at 8, 10; P. App. 70, 28:20-25; P. App. 71, 29:9-20; P. App. 164, Video at 34:00-34:20.)  Even so, accepting that Gage believed Pearson had committed serious offenses by at least recklessly hitting a construction worker and attempting to flee from officers, the undersigned concludes that factual disputes on the remaining factors preclude summary judgment.

At the second *Graham* factor, the undersigned finds that there are disputed material facts concerning whether Pearson posed a threat to Gage or another person. Gage testified that he did not believe Pearson was reaching for a weapon and did not see Pearson making furtive movements with his hands.  (P. App. 85, 43:10-18; *see*

*also* P. App. 120-21, 78:23-79:6.)  He also did not warn Pearson that he was going to shoot or that he had a gun.  (P. App. 86, 44:10-12; 44:18-19.)

Plaintiffs have presented evidence from which a jury could find that Pearson had stopped his flight and was not a threat to officers when Gage shot him.  After Gage and Hibschman began pursuing Pearson, Pearson stopped, and the three men each got out of their vehicles.  (P. App. 74-75, 32:16-33:18.)  During this first interaction, Pearson engaged in no assaultive conduct against the officers, and neither officer heard Pearson say anything about taking their weapons (P. App. 55, 13:22-24; P. App. 57, 15:7-10), Pearson did not attempt to fight back, and he did not make any verbal threats to the officers (P. App. 63-66, 21:7-24:4).  Pearson fled after Gage used pepper spray on him 8 to 10 times and struck him three times with the baton over the course of about 60 to 90 seconds.  (P. App. 66, 24:1-4; P. App. 76, 34:7-24.)  After Pearson retreated into his truck, Gage broke out the driver-side window with a baton, yet Pearson did not strike or attempt to strike Gage and did not verbally threaten Gage (P. App. 67-68, 25:24-25:8; P. App. 70, 28:6-17) but instead fled (P. App. 70, 28:14-19).  And he did not drive excessively fast in his attempts to get away.  ((D. App. 3; *see also* P. App 170, 171.)

A jury also could find that, during the second encounter, Pearson stopped his vehicle on his own and did not "ram" Gage's truck.  Investigators determined after the events that Pearson's truck was in park.  Gage initially told investigators he did not notice whether Pearson's truck was in park or not.  (P. App. 173.)  Detective Barrett documented that Hibschman believed Gage reached in and put Pearson's

truck in park after Pearson was removed from his truck.  (P. App. 170; *see also* P. App. 164, Video at 45:05-45:10.)  And while Gage initially told investigators he did not notice whether or not Pearson's truck was in park when he pulled Pearson from the truck and stated he did not place the truck in park (P. App. 173, 175), he later testified at deposition that he had, in fact, "placed [Pearson's] vehicle into park" before pulling him from the vehicle.  (P. App. 114, 72:22-23.)  Although there was collision damage to the driver's side of Pearson's truck and the passenger's side of Gage's, that damage was not necessarily evidence of the violent degree of "ramming" alleged by Gage,[5] and Plaintiffs' expert witness noted the absence of tire scuffing and acceleration transfer that would suggest such ramming.  (P. App. 24.)

Additional evidence could support a finding that Pearson was not a threat to Gage because, when Gage shot Pearson, he was not in Pearson's path had Pearson attempted to flee.  Regarding the position of the trucks when Gage fired, Gage stated that he positioned his truck in front of Pearson's truck "to block his further attempts at escape."  (D. App. 4, ¶ 6.)  This is supported by Exhibit 2 from Gage's deposition, a photograph showing the position of the trucks after the shooting, which shows Gage's truck in front of Pearson's truck.  (P. App. 157; *see also* P. App. 88-90, 42:6-48:6.)  Exhibit 3 from Gage's deposition similarly shows a diagonal rear view of Gage's truck with the driver's side door open and Pearson's truck in the background.

---

[5] Plaintiff's expert witness Jonathyn Priest's conclusion that the vehicle damage was nominal is corroborated by Officer John, the first officer at the scene, who "observed what appeared to be the aftermath of a minor crash scene" between the two vehicles.  (P. App. 166.)

22

(P. App. 158; *see also* P. App. 90, 49:7-14.)  During his deposition, Gage was asked to mark a "1" on Exhibit 3 where he was positioned when he fired his first shot and a "9" where he was positioned when he fired the ninth and final shot.  (P. App. 158; *see also* P. App. 91-92, 49:4-40:16.)   These photos show that Gage was standing on the driver's side of his own truck and began firing his weapon over the bed of his truck at Pearson, who was in the driver's seat of his truck, suggesting Gage was not in Pearson's path when he started firing his weapon.  (*See* P. App. 158; P. App. 92-93, 50:21-51:2; see also P. App. 84-85, 42:3-43:3.)  Additionally, Gage's testimony and his markings on the photograph indicate that his movement while firing his weapon was to the right and further back toward the tailgate of his truck to a position of even greater safety than where he started firing.  (*See* P. App. 91-92, 49:4-50:16.) Autopsy reports record that all five shots to Pearson's body travelled from back to front (P. App. 185), and Gage denied that he fired any shots through the front of Pearson's windshield (P. App. 103-04, 61:16-62:1).  Priest, Plaintiffs' expert witness, determined that "[d]uring all times during the firearm discharge events, Officer Gage was in a position perpendicular to the driver's side of the Pearson vehicle," and "[no] evidence or information within the provided materials supports Officer Gage was in the pathway of the Pearson vehicle prior to or during the firearm discharge events." (P. App. 24.)  Crediting this evidence, a jury could determine that Gage was beside Pearson's truck—not in the path of it—when he began shooting and moved to a position of even reduced risk as he fired shots at Pearson.

23

Finally, Plaintiffs have presented evidence that would allow a jury to discredit Gage's and Hibschman's versions of events. During the pursuit, Gage and Hibschman communicated with each other using Zello. (P. App. 175, P. App. 121-22, 79:22-80:24.) Detective Renfro knew that the app would have preserved their communications on their phones and asked to access them, at least on Hibschman's phone. (P. App. 170.) Within hours after Pearson was shot, however, the men deleted the Zello app from their phones. (P. App. 121-23, 79:21-81:11; P. App. 164, Video at 1:16:29-1:16:40; 1:16:40-1:17:00; 1:17:40-1:17:58; P. App. 170.) When questioned by Detective Renfro, Hibschman said he got rid of Zello "not too long" before the interview, but he eventually admitted that he deleted it the night of the shooting. (P. App. 164, Video at 1:16:29-1:16:40.) Hibschman said that he did so because his supervisor (Soto) told him to (P. App. 164, Video at 1:16:40-1:17:00; 1:17:40-1:17:58), but Soto told the investigator that he did not advise Gage or Hibschman to delete messages. (P. App. 170.) Gage testified that some unknown moderator on that particular Zello channel "apparently deleted the channel or deleted the conversations at some point in time after the incident." (P. App. 123, 81:2-11.) According to Gage, he overheard an unknown officer talking about a moderator deleting a Zello channel and speculates it was Soto. (P. App. 127-29, 85:22-87:24.) Other than these conflicting accounts, Gage provides no other explanation as to why two police officers—whose job typically is to preserve all relevant evidence—would instead destroy contemporaneous communications between the only surviving participants. In these circumstances, a jury could find

24

that Gage and Hibschman purposefully deleted the app because its contents were inconsistent with their recounted version of events. *See In re Vaxart, Inc. Sec. Litig.*, No. 20-CV-05949-VC, 2025 WL 1869694, at *1 (N.D. Cal. July 7, 2025) (concluding that reasonable jury could infer defendant's knowledge of insider trading based on his deletion of texts); *cf. Jones v. Riot Hosp. Grp. LLC*, No. CV-17-04612-PHX-GMS, 2022 WL 3682031, at *6 (D. Ariz. Aug. 25, 2022) (absence of reasonable explanation for deletion of texts enabled inference that messages were deleted with intent to prevent them from being used in the litigation). These facts suggesting purposeful deletion of evidence also call into question the credibility of Gage's recitation of the facts and further weighs against granting summary judgment. *See Lampkin v. City of Nacogdoches*, 7 F.3d 430, 436 (5th Cir. 1993) ("To the extent that credibility questions exist . . . a fact-finder will be necessary.").

The evidence presented, considered in its totality and viewed in the light most favorable to Plaintiffs, could support a jury in finding that Pearson had ceased his flight and did not pose a danger to Gage or another person when Gage shot him. The fact issues, therefore, preclude granting summary judgment based on the issue of qualified immunity. *Lytle v. Bexar Cnty., Texas*, 560 F.3d 404, 409 (5th Cir. 2009) (stating that "a defendant challenging the denial of a motion for summary judgment based on qualified immunity must be prepared to concede the best view of the facts to the plaintiff and discuss only the legal issues raised by the appeal"). Because there are disputed issues of material fact relevant to whether the force used by Gage was excessive, the case should proceed at this stage. *See Lampkin*, 7 F.3d at 435-36 ("Rule

25

56 still has vitality in qualified immunity cases if the underlying historical facts in dispute that are material to the resolution of the questions whether the defendants acted in an objectively reasonable manner in view of the existing law and facts available to them."); *Johnston v. City of Houston*, 14 F.3d 1056, 1061 (5th Cir. 1994) (denying summary judgment on the basis of qualified immunity where the parties had different versions of what had occurred on material issues).

### 2. At the time of these events, shooting a person who was not in active flight and did not pose a danger violated clearly established law.

Gage may still be entitled to qualified immunity if Plaintiffs cannot show that Gage's actions violated clearly established law. *Ashcroft*, 563 U.S. at 735. "It has long been clearly established that, absent any other justification for the use of force, it is unreasonable for a police officer to use deadly force against a fleeing [suspect] who does not pose a sufficient threat of harm to the officer or others." *Lytle v. Bexar Cnty.*, 560 F.3d 404, 418 (5th Cir. 2009) (citing *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)); *Bazan ex rel. Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 488 (5th Cir. 2001); *see also Reyes v. Bridgewater*, 362 Fed. App'x at 409 (5th Cir. 2010) ("The cases on deadly force are clear: an officer cannot use deadly force without an immediate serious threat to himself or others.").

As noted above, while the instant motion was pending, the Supreme Court decided *Barnes*, and the Court ordered the parties to submit supplemental briefs addressing *Barnes*'s impact (Dkt. No. 60) in light of the Supreme Court's rejection of the "moment-of-threat" test because it conflicted with the totality-of-the-

26

circumstances inquiry. *Barnes*, 145 S. Ct. at 1356. Having reviewed the parties' supplemental briefing (Dkt. Nos. 61, 62), the undersigned concludes that even if the Fifth Circuit's "moment of threat" doctrine had not been rejected by the Supreme Court, the summary judgment evidence discussed above creates genuine disputes of material facts with regard to the reasonableness of the force used under either rule— the now rejected "moment of threat" rule or considering the totality of the circumstances as now required under *Barnes*. *See Barnes*, 145 S. Ct. at 1358. That is so because, as explained above, there is sufficient evidence from which a reasonable fact finder could determine that Pearson was parked and did not pose a danger to Gage at the moment when Gage shot him.

In determining whether a right is clearly established, the Court must consider "[its] own and other relevant precedents." *Elder v. Holloway*, 510 U.S. 510, 516 (1994) (cleaned up) (quoting *Davis v. Scherer*, 468 U.S. 183, 192 n.9, (1984)); *see also Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (holding that defendants' conduct violated clearly established law "in light of binding Eleventh Circuit precedent" without deciding whether Supreme Court precedent also clearly established the principle). "We do not require a case directly on point," *Ashcroft*, 563 U.S. 731 at 741, or one "involving 'fundamentally similar' facts," *Hope*, 536 U.S. at 741 (quoting *United States v. Lanier*, 520 U.S. 259, 263 (1997)), but "existing precedent must have placed the statutory or constitutional question beyond debate," *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017).

In addition, "the clearly established right must be defined with specificity."
*City of Escondido v. Emmons*, 586 U.S. 38, 42, (2019).  The right's contours must be
"sufficiently definite that any reasonable official in the defendant's shoes would have
understood that he was violating it."  *Kisela v. Hughes*, 584 U.S. 100, 105 (2018)
(quoting *Plumhoff v. Rickard*, 572 U.S. 765, 774, 779 (2012)).  Although "general
statements of the law are not inherently incapable of giving fair and clear warning,"
*Hope*, 536 U.S. at 741 (quoting *Lanier*, 520 U.S. at 271), "specificity is especially
important in the Fourth Amendment context, where the [Supreme] Court has
recognized that 'it is sometimes difficult for an officer to determine how the relevant
legal doctrine, here excessive force, will apply to the factual situation the officer
confronts,'" *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Saucier v. Katz*, 533 U.S.
194, 205 (2001)).  The "general rules" from *Garner* and *Graham* "do not by
themselves create clearly established law outside an 'obvious case.'"  *Kisela*, 584 U.S.
at 105 (quoting *White*, 580 U.S. at 80).

Plaintiffs direct the Court's attention to two lines of cases involving officers
shooting the driver of a vehicle.  (*See* Dkt. No. 46 at 30-40.)  In one line of cases, the
vehicle presented a reasonable threat to the officers because the vehicle was quickly
moving in the officers' direction, and the officers involved were granted qualified
immunity due to their deadly force being justified as a result of the vehicles moving
in their direction.  *See Hathaway v. Bazany*, 507 F.3d 312, 315-16, 322 (5th Cir. 2007);
*Sanchez v. Edwards,* 433 F. App'x 272, 273-74 (5th Cir. 2011); *Irwin v. Santiago*, No.

21-10020, 2021 WL 4932988, at *3 (5th Cir. Oct. 21, 2021) (unpublished).  In the

second line of cases, the suspect vehicles were not headed in the direction of the

officers, making their use of deadly force excessive and unreasonable.  *See Lytle*, 560

F.3d at 409; *Flores v. City of Palacios*, 381 F.3d 391, 399 (5th Cir. 2004); *Edwards v.

Oliver*, 31 F.4th 925, 931-32 (5th Cir. 2022); *Ramos v. Taylor, Ramos v. Taylor*, 646 F.

Supp. 3d 807, 819 (W.D. Tex. 2022); *Crane v. City of Arlington, Texas*, 50 F.4th 453,

467 (5th Cir. 2022).

     Plaintiffs argue that the evidence in this case is unlike *Hathaway*, *Sanchez*, and

*Irwin* because in each of those cases, the vehicles involved were headed in the general

direction of the officers, which the Fifth Circuit found justified their uses of deadly

force.  (*See id*. at 31-32.)  Plaintiffs argue that the evidence in this case is more

factually similar to *Lytle*, *Flores*, *Edwards*, *Ramos*, and *Crane*, because in each of those

cases the vehicle was not headed in the direction of the officer and thus did not

present an imminent threat of serious harm justifying the use of deadly force.  (*See id*.

at 33-40.)

     In *Lytle*, the Fifth Circuit determined that an officer was not entitled to

qualified immunity because he shot at the rear of a fleeing vehicle that did not

present an imminent threat to the officer where the vehicle was not headed in the

direction of the officer and was three to four houses away.  *Lytle*, 560 F.3d at 409.  In

*Flores*, the Fifth Circuit found qualified immunity was not appropriate when the

officer shot from behind the fleeing vehicle.  *Flores*, 381 F.3d at 399.  In *Edwards*, the

Fifth Circuit determined the officer was not entitled to qualified immunity for shooting and killing the passenger of a vehicle that was moving away from the officers, not in their direction. *Edwards*, 31 F.4th at 931-32.  In *Ramos*, a case from the Western District of Texas, the court concluded that officers were not entitled to qualified immunity at the Rule 12(b)(6) stage when they fired into a vehicle from behind as the vehicle was driving away from them. *Ramos*, 646 F. Supp. 3d at 818.  In *Crane*, the Fifth Circuit denied qualified immunity to an officer who shot a man who was in a parked car; and thus, was not presenting a threat to the people standing around the car. *Crane*, 50 F.4th at 467.

In the seminal case of *Tennessee v. Garner*, the decedent was inside a house that was believed to have been being broken into. *Garner*, 471 U.S. at 1.  When officers arrived, the decedent fled into the yard near the chain-link fence. *Id.*  The officer in question agreed that he thought the decedent was unarmed, but when he called out instructing the decedent to "halt," the decedent began to climb the fence at which point the officer shot him in the back of the head. *Id.*  The Court explained, "[w]here the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Id.* at 11.  The Court went on to state that "if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Id.* at 11–12.

30

At the time Gage shot Pearson, the law was clear that it is unreasonable for a police officer to use deadly force by firing a gun at a suspect in a vehicle who is not fleeing and does not pose a sufficient threat of harm to the officer or others. *See Lytle*, 560 F.3d at 417; *Garner*, 471 U.S. at 11. And even though *Edwards*, *Ramos*, and *Crane* do not themselves create clearly established law because they were decided after the date of the incident giving rise to this case, the Fifth Circuit nevertheless determined that the law was clearly established based on existing law at the time of those decisions, that none of the vehicles in these cases—as the evidence shows in this case—were headed in the direction of the officers. *See Edwards*, 31 F.4th at 932; *Ramos*, 646 F. Supp. 3d at 819; *Crane*, 50 F.4th at 467. Moreover, as the Fifth Circuit has explained, "we have long held that the use of 'deadly force' is unreasonable where the officer does not have 'probable cause to believe that the suspect pose[d] a threat of serious physical harm, either to the officer or to others.'" *Aguirre v. City of San Antonio*, 995 F.3d 395, 412-13 (5th Cir. 2021) (citing *Gutierrez v. City of San Antonio*, 139 F.3d 441, 446 (5th Cir. 1998) (quoting *Garner*, 471 U.S. at 11)).

Based on the foregoing, the law clearly establishes that Gage would have been on notice that his use of deadly force would be unconstitutional unless he had probable cause to believe the deadly force used was necessary to prevent escape because Pearson threatened him with a weapon or there was probable cause to believe that Pearson had committed a crime involving the infliction or threatened infliction of serious physical harm. *See Garner*, 471 U.S. at 11–12. Here, Pearson never threatened Gage with a weapon, and there is disputed evidence as to whether

31

Pearson was involved in a crime that inflicted serious physical harm to Gage or anyone else. And, as explained above, there are disputed material facts concerning whether Pearson was in active flight or posed a threat to Gage or anyone else when he was shot.

Because the evidence calls into question whether Gage had probable cause to believe that Pearson posed a threat of serious harm at the time he used deadly force, Gage is not entitled to qualified immunity at this stage. *See Lytle*, 560 F.3d at 411 ("[R]easonableness under the Fourth Amendment should frequently remain a question for the jury. To put the matter more directly, since we lack a clearly defined rule for declaring when conduct is unreasonable in a specific context, we rely on the consensus required by a jury decision to help ensure that the ultimate legal judgment of 'reasonableness' is itself reasonable and widely shared." (quoting *Abraham v. Raso*, 183 F.3d 279, 290 (3d Cir. 1999))).

## B.    Wrongful Death Claim

Plaintiffs also assert a wrongful death claim under § 1983, and a survival action on behalf of Pearson's estate (presumably under state law. (*See* Compl. ¶¶ 157-63, 166-70.) The Fifth Circuit has consistently held that § 1983 incorporates state wrongful death and survivorship statutes. *Brazier v. Cherry*, 293 F.2d 401, 403 (5th Cir. 1961); *Rhyne v. Henderson Cnty.*, 973 F.2d 386, 390 (5th Cir. 1992). The Fifth Circuit later clarified that "both the wrongful death claim of plaintiffs themselves and survival claims of the decedent are available under § 1983 if state law authorizes those claims." *De Paz v. Duane*, 858 Fed. Appx. 734, 737 (5th Cir. 2021).

After analyzing Texas Civil Practice and Remedy Code § 71.004(a) which governs wrongful death actions and Texas Civil Practice and Remedy Code § 71.021(b) which governs survival actions, the Fifth Circuit held, "as incorporated through § 1988, civil rights plaintiffs in Texas may recover for their own injuries and the injuries of a deceased person resulting from the constitutional violations of government actors if the plaintiffs are the surviving spouse, children, parents, heirs, legal representatives, or estate of the deceased." *Id.* at 737-38.

42 U.S.C. § 1988 provides that state common law is used to fill the gaps in administration of civil rights suits. 42 U.S.C. § 1988(a). Therefore, a party must have standing under the state wrongful death or survival statutes to bring a claim under 42 U.S.C. §§ 1981, 1983, and 1988. *See Rhyne v. Henderson County*, 973 F.2d 386, 390–91 (5th Cir. 1992) (finding that standing under Texas wrongful death and survival statutes is incorporated into the Federal Civil Rights Statutes); *Brazier v. Cherry*, 293 F.2d 401, 409 (5th Cir. 1961) (looking to Georgia wrongful death and survival statutes to determine standing under the federal Civil Rights Statutes).

Here, Gage does not seek dismissal Plaintiffs' wrongful death and survival claims and does not challenge Plaintiffs' standing to bring such claims. (*See generally* D. Br.) Because the undersigned finds that Gage is not entitled to qualified immunity at this stage of the proceedings, he is also not entitled to summary judgment on Plaintiffs' wrongful death and survival claims.

33

## IV.  RECOMMENDATION

Because Plaintiffs have produced adequate evidence to raise a fact issue with respect to Gage's qualified immunity defense, it is **RECOMMENDED** that Gage's Motion for Summary Judgment (Dkt. No. 40) be **DENIED**, and Plaintiffs' claims should proceed to trial.

**SO RECOMMENDED** on August 18, 2025.

_____
BRIAN McKAY
UNITED STATES MAGISTRATE JUDGE

## NOTICE OF RIGHT TO OBJECT

A copy of these findings, conclusions, and recommendation will be served on all parties in the manner provided by law.  Any party who objects to any part of this report and recommendation must file specific written objections within 14 days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  To be specific, an objection must identify the finding or recommendation to which objection is made, state the basis for the objection, and indicate the place in the magistrate judge's report and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996), *modified by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections to 14 days).